**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

---

PERRONE ROBOTICS, INC. AND PERRONE
ROBOTICS INNOVATIONS, LLC,

*Plaintiffs,*

v.

NISSAN NORTH AMERICA, INC. AND
NISSAN MOTOR CO., LTD.,

*Defendants.*

---

Civil Action No.  3:25cv982

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC file this Complaint for patent infringement against Defendants Nissan North America, Inc. and Nissan Motor Co., Ltd. (collectively, "the Nissan Defendants") for infringing U.S. Patent Nos. 12,181,877; 11,782,442; 11,314,251; 9,833,901; and 9,195,233 (collectively, the "Patents-in-Suit") and allege as follows:

### PARTIES

1.      Perrone Robotics, Inc. is a stock corporation organized and existing under the laws of Delaware, with its principal place of business located at 1000 Research Park Boulevard, Suite 106, Charlottesville, Virginia 22911. Perrone Robotics, Inc. owns 100% of the equity interests of Perrone Robotics Innovations, LLC.

2.      Perrone Robotics Innovations, LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at 1000 Research Park Boulevard, Suite 106, Charlottesville, Virginia 22911. Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC (collectively, "Perrone Robotics") own all right, title, and interest in

the Patents-in-Suit, including the right to assert all causes of action under the Patents-in-Suit and the right to any remedies for the infringement of the Patents-in-Suit.

3.      Nissan Motor Co., Ltd. is a corporation organized and existing under the laws of Japan with its registered head office at 2, Takara-cho, Kanagawa-ku, Yokohama-shi, Kanagawa 220-8623, Japan, and global headquarters at 1-1, Takashima 1-chome, Nishi-ku, Yokohama-shi, Kanagawa 220-8686, Japan. Upon information and belief, Nissan Motor Co., Ltd is the parent corporation of Nissan North America, Inc. Nissan Motor Co., Ltd., through its various entities, designs, manufactures, markets, distributes and sells Nissan and Infiniti automobiles in Virginia and this District and multiple other locations in the United States and worldwide.

4.      Nissan North America, Inc. is a corporation organized and existing under the laws of Delaware and having its principal place of business at One Nissan Way, Franklin, Tennessee 37067. Upon information and belief, Nissan North America, Inc. is a subsidiary of Nissan Motor Co., Ltd. and imports, manufactures, and distributes Nissan and Infiniti brand automobiles to dealers in the United States, including in Virginia and this District. Nissan North America, Inc. may be served through its registered agent for process, Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, Virginia 23219-4100.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

6.      This Court has personal jurisdiction over the Nissan Defendants because the Nissan Defendants have had minimum contacts with Virginia such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. In particular, the Nissan Defendants have committed acts of infringement in violation of 35 U.S.C. § 271 in this District

and have placed Infringing Products[1] into the stream of commerce, through an established distribution channel, with the knowledge and/or understanding that such products will be used and sold in Virginia and this District, including at Nissan's and Infiniti's numerous dealerships within Virginia and this District. These acts caused and continue to cause injury to Perrone Robotics within Virginia and this District. The Nissan Defendants derive substantial resources from the sale of Infringing Products distributed within Virginia and this District, derive substantial revenue from interstate and international commerce, and expect or should reasonably expect their actions to have consequences within Virginia and this District.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

8.      The Nissan Defendants have committed acts of infringement in this District by making, using, offering for sale, selling, and/or importing products or services that infringe the Patents-in-Suit, or by inducing others to infringe the Patents-in-Suit. The Nissan Defendants have regular and established places of business in this District. By way of example, Nissan North America, Inc. has a training center in Sterling, Virginia. The Nissan Defendants also offer for sale or make available for sale infringing vehicles at numerous Nissan and Infiniti dealerships in this District.

9.      Nissan North America, Inc. is registered to do business in Virginia. Its registered agent is Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, Virginia 23219-4100.

10.     The Nissan Defendants derive benefits from their presence in this federal judicial District, including, but not limited to, sales revenue from the sale of Nissan and Infiniti vehicles in this District.

---

[1] Exhibit F contains a preliminary list of the Nissan Defendants' "Infringing Products," which Perrone Robotics will update and revise based on discovery in this case.

## THE PATENTS-IN-SUIT

11.     On December 31, 2024, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 12,181,877 ("the '877 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '877 Patent. A copy of the '877 Patent is attached as Exhibit A.

12.     On October 10, 2023, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,782,442 ("the '442 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '442 Patent. A copy of the '442 Patent is attached as Exhibit B.

13.     On April 26, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,314,251 ("the '251 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '251 Patent. A copy of the '251 Patent is attached as Exhibit C.

14.     On December 5, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,833,901 ("the '901 Patent") titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '901 Patent. A copy of the '901 Patent is attached as Exhibit D.

15.     On November 24, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,195,233 ("the '233 Patent"), titled "General Purpose Robotics

Operating System" to Perrone Robotics, Inc. Perrone Robotics owns and holds all rights, title and interest in and to the '233 Patent. A copy of the '233 Patent is attached as Exhibit E.

## FACTUAL ALLEGATIONS

### Perrone Robotics' Technology

16.    Paul Perrone, the founder and CEO of Perrone Robotics, Inc., is a computer engineer and pioneer in the automated driving space. Perrone is the sole inventor of each of the Patents-in-Suit.

17.    In 2003, Perrone and his company Perrone Robotics, Inc. began working on automated devices and robots. The problem he identified was that every time a manufacturer wanted to make a robot or automated device, the manufacturer started from scratch and created specific hardware and software for the specific robot or automated device. This was inefficient and inhibited the ability to mass produce robots and automated devices.

18.    To solve this problem, Perrone came up with the novel idea of a general purpose robotics operating system ("GPROS") with application services that could be used across robots and automated devices and that could be configured to the specific robot or automated device. Today, such GPROSs are in existence, but at the time of Perrone's invention, they were unheard of. Perrone's invention of a GPROS with configurable applications is embodied in Perrone Robotics, Inc.'s full-stack robotic and automated software platform, MAX.

19.    In 2005, Perrone Robotics, Inc. entered the DARPA Grand Challenge, a race across the Mojave desert with a $2 million prize for anyone who could build a driverless vehicle that could complete the 100+ mile desert journey. Perrone Robotics, Inc.'s vehicle, Tommy, was one of the small number of applicants accepted as a semifinalist to enter the race. Tommy relied on Perrone Robotics, Inc.'s MAX platform. Perrone's understanding of the state of the industry was

reinforced as he observed during the 2005 DARPA Grand Challenge that the other entrants were building specific hardware and software for the specific vehicle and that they were not relying on a GPROS that could be used across multiple vehicles.

20.     In February 2006, Perrone Robotics, Inc. filed for what became the '233 Patent to protect its foundational intellectual property related to using a GPROS in robots and automated devices, as embodied in Perrone Robotics, Inc.'s software platform, MAX. Perrone Robotics, Inc. subsequently filed the other four Patents-in-Suit.

21.     The inventions claimed in the Patents-in-Suit represent a significant technological advancement over the prior art robotics architectures. Previously, when someone wanted to build a robot or automated device, they had to create specific hardware and software for the robot or automated device. These rigid, vertically integrated control systems where application software was tied to specific hardware configurations were inefficient and prevented widespread deployment of robotic and automated devices. This conventional approach generally required developers to write custom, hardware-specific code for every new sensor, actuator, or mobility platform, or hard-coded configurations, algorithms, and behaviors, creating a technical barrier to interoperability and scalability. The Patents-in-Suit solve this specific computing problem through the non-conventional architecture of the GPROS, which introduces a novel layer of generic abstractions and dynamic configuration services that were neither well-understood nor routine in the field. The resulting GPROS could be deployed across different robots and automated devices and used with different sensors and hardware, with varying communication protocols, and with configurable algorithms for robotics and automation control. The solution of using a GPROS was not well-understood, routine, or conventional at the time of the invention.

22.    The Patents-in-Suit also solved a significant technological problem in the prior art by describing application services that are "(i) completely configurable by using a config service, (ii) can be adapted both statically and dynamically, and (iii) provides access to configuration data using a generic abstraction." '233 Pat. Col. 41 ll. 53–57. The configurability of the application services and the ability to access configuration data were critical to solving the problem of being able to deploy the GPROS across different devices and with different sensors and hardware. The concepts set forth in this claim element were not well-understood, routine, or conventional at the time of the invention in the field of robotics and automation. Similarly, application services that can be "adapted both statically and dynamically" represent an important technological leap forward. This dual-mode adaptability is not merely a refinement of conventional configuration techniques; it represents a sophisticated solution to the technical problem of allowing modifications to robotic and automated systems. This sophisticated level of adaptability, operating in concert with a GPROS, was not well-understood or routine in the robotics field at the time of invention, particularly not as a deployable feature applicable across multiple hardware platforms.

23.    The claim elements of the Patents-in-Suit related to a GPROS with configurable application services, separately, and in combination with the other claim elements, solved the problem that existed in the prior art that to create a robot or automated device, a manufacturer had to create hardware and software for the specific device. This solution was not well-understood, routine, or conventional at the time. Since the invention, automakers have relied on the patented technology to facilitate deployment of fleets of automated vehicles, which was not possible and was not done before the invention of the Patents-in-Suit.

24.    The Patents-in-Suit, which generally describe a GPROS to manage an autonomous vehicle service, also address the significant problem in the prior art of needing to build specific

7

hardware and software for each vehicle. The Patents-in-Suit generally describe a method of using a GPROS with configurable application services and other claim elements to achieve an autonomous vehicle service or autonomous movement planning service. These concepts were not previously well-understood, routine, or conventional in the field of robotics and automation.

25. The invention of the Patents-in-Suit also provides a technical solution to the long-standing robotics challenge of hardware heterogeneity through a hardware-independent abstraction layer that manages services across disparate platforms. Notably, the Patents-in-Suit do not simply provide static hardware abstraction; rather, they integrate "a service to manage synchronous, asynchronous, and real time application threads." This inventive thread management system solves a concrete technical problem inherent to robotics: the need to coordinate sensor processing, decision-making, and actuator control across hardware platforms.

26. The Patents-in-Suit also disclose a fusion service that implements an unconventional solution to the technical problem of integrating multiple sensors in real-time systems. This approach was not well-understood, routine, or conventional because it achieves hardware independence while maintaining the tight timing requirements of real-time vehicle control—a technical problem that prior-art systems solved through hardware-specific, non-portable implementations rather than through the disclosed invention.

27. The Patents-in-Suit also claim updating a set of application services with downloaded software from a network, enabling modification of control logic without physical intervention. This capability represents a non-routine and non-conventional technical achievement in safety-critical systems. Traditional control systems employ tightly integrated, statically-compiled firmware that requires factory recalls, service center visits, and extensive re-certification for modifications—particularly for safety-critical functions like steering, braking, and throttle

8

control. The claimed ability to push application service updates, including over-the-air, while preserving the integrity of real-time thread management, maintaining hardware platform independence, and ensuring coordinated multi-actuator control represents a fundamentally different and non-conventional approach. This dynamic reconfiguration capability enables in certain embodiments, rapid deployment of new algorithms, updated sensor parameters, modified planning logic, and corrected control behaviors—a technical advance that was not well-understood or routine in the automated vehicle industry.

28.     The Patents-in-Suit also claim a GPROS comprising a suite of configurable application services to enable composition of rich and complex robotic and automation applications with peripherals such as sensors and actuators in a hardware independent fashion. GPROSs specifically addressed the shortcomings of the prior art and provided a path and means for creating rich and complex robotics and automation applications. The prior art generally relied upon hard-coded configurations, brittle and non-configurable algorithms and behaviors, and hard-coded binding to specific sensors and actuation methods, which prevented the complex robotics and automation applications that GPROSs facilitated.

**The Nissan Defendants' Infringement**

29.     Much has changed since 2006 when Perrone Robotics Inc. filed its original patent application, which became the '233 Patent. Consumer demand and regulatory agencies have pushed automakers like the Nissan Defendants to provide more automated features in their vehicles, which, among other benefits, increase safety and driver convenience. For instance, in May 2024, the National Highway Traffic Safety Administration finalized a rule that would require automakers to include automatic emergency braking in all their new cars and light trucks by 2029.

30.    To facilitate deployment of automated vehicle features across their fleets, automakers like the Nissan Defendants rely on the use of a GPROS with configurable applications, the very technology that is described in Perrone Robotics' foundational patents. On information and belief, the Nissan Defendants have relied on GPROSs that include a proprietary GPROS built in conjunction with Red Hat[2]; Linux-based GPROS[3]; a MICROSAR GPROS[4]; and an AUTOSAR-based GPROS.[5]

31.    The Nissan Defendants offer their Advanced Driver-Assistance System ("ADAS") features through the ProPILOT Assist programs, including the ProPILOT Assist 1.1, 2.0, and 2.1 programs.[6] The Nissan Defendants promote the ProPILOT Assist program as "a hands-on driver assist system that combines Nissan's Intelligent Cruise Control and Steering Assist technologies and includes a stop and hold function that can bring the vehicle to a full stop, hold in place and can bring you back up to speed when traffic starts moving again."[7]

---

[2] https://www.mobilityoutlook.com/news/red-hat-achieves-milestone-with-asil-b-certified-in-vehicle-operating-system/

[3] https://www.mobileye.com/blog/mobileye-leads-the-industry-in-embracing-linux-for-safety-related-applications/; https://www.mobileye.com/blog/fact-sheet-mobileye-advanced-driver-assistance-systems-adas/

[4] https://cdn.vector.com/cms/content/know-how/VJ/PDF/TechnicalArticle-NISSAN_MICROSAR_EN.pdf

[5] https://www.automotiveworld.com/articles/how-is-autosar-software-developed/

[6] On information and belief, during the past six years, all vehicles using any ProPILOT Assist version infringe the Patents-in-Suit, which on information and belief include ProPILOT Assist, ProPILOT Assist 1.1, ProPILOT Assist 2.0, ProPILOT Assist 2.1, and ProPILOT Assist with Navilink. In this Complaint, references to "ProPILOT Assist" or "ProPILOT" refer to all versions of ProPILOT Assist implemented in vehicles made, sold, used, imported, and/or offered for sale during the past six years. The specific descriptions of ProPILOT Assist below are exemplary and may not apply to all versions of ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) have varying option levels for ProPILOT Assist.

[7] https://www.nissanusa.com/experience-nissan/news-and-events/nissan-propilot-assist.html



**WHAT IS PROPILOT ASSIST?**

ProPILOT Assist is a hands-on driver assist system that combines Nissan's Intelligent Cruise Control and Steering Assist technologies and includes a stop and hold function that can bring the vehicle to a full stop, hold in place and can bring you back up to speed when traffic starts moving again. [*]

ProPILOT Assist with Navi-link syncs with the navigation system providing additional information to better predict the freeway ahead. New features include Speed Adjust by Route that can help reduce your speed for tight curves and off-ramps, as well as Speed Limit Assist that gives drivers the option to quickly adjust the set speed to the posted speed limit. Both features allow for a more intuitive, enjoyable drive. [*]



AVAILABLE NISSAN VEHICLES WITH PROPILOT ASSIST  ›

BUILD & PRICE VEHICLES WITH PROPILOT ASSIST  ›

Nissan ARIYA shown. [*]

32.     Nissan promotes its ProPILOT Assist 2.0 as "giving you the option to experience hands-off single-lane driving, as well as hands-on guided lane changing abilities. ProPILOT Assist 2.0 can give you the control you need."[8]

33.     ProPILOT Assist includes ADAS vehicle applications such as intelligent cruise-control, lane centering, and overtaking slower vehicles.[9]

ProPILOT Assist 1.1 is the earliest version, primarily focused on single-lane highway driving with adaptive cruise-control and lane-keeping assistance. It helps the driver maintain speed, distance from other vehicles, and stay centered in the lane but requires hands-on operation. ProPILOT Assist 2.0 introduced hands-off driving capabilities in certain conditions, such as mapped highways, and enhanced land change assistance. The latest version is ProPILOT 2.1, builds on these features by adding more advanced capabilities, such as overtaking slower vehicles, and allowing hands-off steering and feet-off pedals for a smoother driving experience. However the driver must remain attentive and be ready to take control at any moment.

34.     Additional features include "Speed Adjust by Route that can help reduce your speed for tight curves and off-ramps, as well as Speed Limit Assist that gives drivers the option to quickly adjust the set speed to the posted speed limit."[10]

---

[8] *Id.*
[9] *Id.*
[10] *Id.*

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 12,181,877

35.     Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

36.     On December 31, 2024, the United States Patent and Trademark Office duly and legally issued the '877 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '877 Patent is attached as Exhibit A.

37.     The '877 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

38.     Perrone Robotics owns all rights, title, and interest in and to the '877 Patent, including the right to assert all causes of action under the '877 Patent and the right to any remedies for the infringement of the '877 Patent.

39.     The '877 Patent is generally directed to a vehicle which includes a novel GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

40.     The Nissan Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '877 Patent, including at least claims 1, 2, 3, 4, 5, 6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21, in violation of 35 U.S.C. § 271(a) by their manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the '877 Patent literally or under the doctrine of equivalents.

41.     For example, claim 1 of the '877 Patent recites:

1. A vehicle comprising:

a steering mechanism, a brake, and a throttle;

an operating system comprising a set of application services configured to manage at least one obstacle service of the vehicle, the vehicle configured to use a movement plan, wherein the set of application services is independent of an underlying hardware platform and is configurable to perform at least one communication task and at least one operational task, wherein the set of application services:

is configurable using a configuration service,

is configurable to be adapted both statically and dynamically, and

is configurable to access configuration data using a generic abstraction; and

a graphical user interface,

wherein the vehicle is adapted to receive the configuration data over a network, and

wherein the vehicle is adapted to avoid obstacles.

42.    By way of a non-limiting example, the Nissan Defendants' vehicles that include ProPILOT Assist such as the Nissan Rogue comprise vehicles, as required by claim 1.

43.    The Nissan Defendants' vehicles such as the Nissan Rogue include a steering mechanism, a brake, and a throttle, as required by claim 1. By way of example, lane centering relies on a steering mechanism to keep the vehicle centered in the lane. As a further example, ProPILOT Assist's intelligent cruise control relies on a brake and throttle to increase or decrease speed.

44.    Vehicles with ProPILOT Assist practice an operating system comprising a set of application services configured to manage at least one obstacle service of the vehicle, as required by claim 1. On information and belief, vehicles with ProPILOT Assist have relied on GPROSs that include a proprietary GPROS built in conjunction with Red Hat; a Linux-based GPROS; a MICROSAR GPROS; and an AUTOSAR-based GPROS. ProPILOT Assist includes a set of application services that manages at least one obstacle service of the vehicle, including Nissan's

intelligent cruise-control, which slows the vehicle down to avoid hitting the car or obstacle in front of the vehicle.

45.    The Nissan Defendants' vehicles equipped with ProPILOT Assist, including the Nissan Rogue, are configured to use a movement plan, as required by claim 1. By way of example, Vehicles with ProPILOT Assist utilize a movement plan when they use lane centering to move the steering wheel to keep the vehicle centered in a lane based on a movement plan.

46.    Vehicles with ProPILOT Assist practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one communication task and at least one operational task, as required by claim 1. By way of example, ProPILOT Assist is independent of the underlying platform and can be used across Nissan and Infiniti models, including the Nissan Rogue. Vehicles with ProPILOT Assist perform operational tasks, including intelligent cruise control and lane centering. Vehicles with ProPILOT Assist perform communication tasks such as communication with the sensors and over-the-air updates.

47.    Vehicles with ProPILOT Assist practice a set of application services that are configurable using a configuration service, are configurable to be adapted both statically and dynamically, and that are configurable to access configuration data using a generic abstraction, and that has a graphical user interface, as required by claim 1. By way of example, ProPILOT Assist allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. ProPILOT Assist calibration is configurable to be adapted both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes

to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

48.    The Nissan Defendants' vehicles equipped with ProPILOT Assist, including the Nissan Rogue, are adapted to receive configuration data over a network, as required by claim 1. By way of example, ProPILOT Assist includes an over-the-air software update.

49.    The Nissan Defendants' vehicles equipped with ProPILOT Assist, including the Nissan Rogue, are adapted to avoid obstacles. By way of example, vehicles with ProPILOT Assist include intelligent cruise-control, which slows the vehicle down to avoid hitting the car or obstacle in front of the vehicle.

50.    For the reasons discussed above as well as throughout in the context of other patent claims, the Nissan Defendants' vehicles with ProPILOT Assist also infringe claims 2, 3, 4, 5, 6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 3 because they have a neural network or rules engine technology. For example, Nissan vehicles with ProPILOT Assist use a control framework within intelligent cruise control that allows the driver to preset parameters such as the desired following distance and target speed, and based on the inputs, the system control throttle, braking, and steering. This rule-based control and coordination across multiple electronic control units corresponds to a rules engine technology. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 4 because, on information and belief, the vehicles are configured to move based on GPS data, map data, and sensor data, including in intelligent cruise control and lane following assist. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 10 because the set of application services comprises a range service such as intelligent cruise control and claim 11 because the set of application services

15

comprises a navigation course service when it uses data from sensors to provide lane centering and cruise control guidance. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 21 because they use a brake mechanism controlled based on data consisting of data received from at least one optical sensor when, on information and belief, they use a front camera (i.e., an optical sensor) to determine the distance of the vehicle in front of them.

51.     Further, at least since being served with this Complaint, the Nissan Defendants have indirectly infringed and continue to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21 of the '877 Patent. The Nissan Defendants actively induce infringement of the '877 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, the Nissan Defendants knowingly induce their customers and dealers to use, sell, and offer for sale vehicles that they know or should know infringe one or more claims of the '877 Patent. The Nissan Defendants instruct their customers to use and instruct their vehicle dealers to sell and offer for sale vehicles containing the patented invention, and specifically intend for those customers and dealers to infringe one or more claims of the '877 Patent by using, selling, and offering for sale vehicles containing infringing technology such as ProPILOT Assist. Among other inducement actions, the Nissan Defendants' instructional, marketing, and sales materials inform customers and dealers about the use of ProPILOT Assist and tout the advantages of using ProPILOT Assist.

52.     The Nissan Defendants' acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from the Nissan Defendants the damages they have sustained as a result of the Nissan Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '877 Patent, together with interests and costs as fixed by the Court.

53.    The Nissan Defendants have had notice of the '877 Patent at least as of the date of this Complaint.

54.    At all times since the '877 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner. For example, since the '877 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Perrone Robotics, Inc. Company Confidential. Copyright 2025. All rights reserved. TONY and MAX are patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251, 11,782,442, 12,181,877) and Canada (2643378). TONY and MAX have additional patents pending. MAX, Perrone Robotics, TONY, and "Mobility of People and Things" are registered trademarks of Perrone Robotics.

## COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 11,782,442

55.    Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

56.    On October 10, 2023, the United States Patent and Trademark Office duly and legally issued the '442 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '442 Patent is attached as Exhibit B.

57.    The '442 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

58.    Perrone Robotics owns all rights, title, and interest in and to the '442 Patent, including the right to assert all causes of action under the '442 Patent and the right to any remedies for the infringement of the '442 Patent.

59.    The '442 Patent is generally directed to a novel autonomous vehicle which includes a GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

60.     The Nissan Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '442 Patent, including at least claims 1, 2, 3, 4, 6, 7, 8, 9, 11, 12, 13, 15, 17, 18, 19, and 20, in violation of 35 U.S.C. § 271(a) by their manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include ProPILOT Assist. The Nissan Defendants have also directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '442 patent that are identified in the prior sentence when they perform the methods by testing and using their own infringing vehicles, including but not limited to vehicles that include ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the '442 Patent literally or under the doctrine of equivalents.

61.     For example, claim 8 of the '442 Patent recites:

8. An autonomous vehicle comprising:

a vehicle having a steering mechanism, a brake, and a throttle;

a general purpose robotics operating system comprising a set of application services configured to manage at least one of synchronous, asynchronous, or real time application threads, wherein the set of application services is independent of an underlying hardware platform and is configurable to perform at least one of communication tasks and operational tasks;

a steering servomechanism configured to control the steering mechanism based on a movement plan;

a brake servomechanism configured to control the brake based on the movement plan; and

a throttle servomechanism configured to control the throttle based on the movement plan.

62.     By way of a non-limiting example, the Nissan Defendants have infringed claim 8 of the '442 Patent with Nissan and Infiniti vehicles that use ProPILOT Assist such as the Nissan Rogue.

63.     The Nissan Defendants' vehicles that include ProPILOT Assist such as the Nissan Rogue comprise autonomous vehicles, as required by claim 8. By way of example, ProPILOT Assist provides autonomous vehicle functions in vehicles such as the Nissan Rogue.

64.     Autonomous vehicles that include ProPILOT Assist such as the Nissan Rogue have a steering mechanism, a brake, and a throttle, as required by claim 8. By way of example, lane centering relies on a steering mechanism to keep the vehicle centered in the lane. ProPILOT Assist's intelligent cruise control relies on a brake and throttle to increase or decrease speed.

65.     Autonomous vehicles that include ProPILOT Assist such as the Nissan Rogue are equipped with a GPROS comprising a set of application services, as required by claim 8. On information and belief, vehicles with ProPILOT Assist have relied on GPROSs that include a proprietary GPROS built in conjunction with Red Hat; a Linux-based GPROS; a MICROSAR GPROS; and an AUTOSAR-based GPROS.

66.     Vehicles with ProPILOT Assist practice a set of application services configured to manage at least one of synchronous, asynchronous, or real time application threads, as required by claim 8. On information and belief, vehicles with ProPILOT Assist have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with ProPILOT Assist receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

67.    Vehicles with ProPILOT Assist practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, as required by claim 8. By way of example, ProPILOT Assist is independent of the underlying platform and can be used across Nissan and Infiniti models, including the Nissan Rogue. Vehicles with ProPILOT Assist perform operational tasks, including intelligent cruise control and lane centering. Vehicles with ProPILOT Assist perform communication tasks such as communication with the sensors and over-the-air updates.

68.    Vehicles with ProPILOT Assist practice a steering servomechanism configured to control the steering mechanism based on a movement plan, a brake servomechanism configured to control the brake based on the movement plan, and a throttle servomechanism configured to control the throttle based on the movement plan, as required by claim 8. By way of example, lane centering relies on a steering servomechanism to keep the car centered in the lane based on a movement plan. ProPILOT Assist's intelligent cruise control relies on a brake and throttle servomechanism to increase or decrease the throttle based on the movement plan.

69.    For the reasons discussed above as well as throughout in the context of other patent claims, the Nissan Defendants' vehicles with ProPILOT Assist also infringe claims 1, 2, 3, 4, 6, 7, 9, 11, 12, 13, 15, 17, 18, 19, and 20. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claims 2, 3, and 4, because on information and belief the steering servomechanism, the brake servomechanism, and the throttle servomechanism are connected to the vehicle by at least one of a fastening system, an adhesive, or a weld. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 7 because vehicles with ProPILOT Assist have maneuver generic services that comprise one or more of a traffic sign handling service, a platooning service, a sudden obstacle avoidance service, a curb avoidance

20

service, a speed bump handling service, a floating obstacle avoidance service, a gated obstacle avoidance service; or a negative obstacle avoidance service, including when they engage in obstacle avoidance through intelligent cruise control. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 15 because vehicles with ProPILOT Assist are configured to transport goods or passengers. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claims 17 and 18 because vehicles with ProPILOT Assist include trucks such as the Titan and units of a group of autonomous vehicles such as specific Nissan vehicles within a model line with ProPILOT Assist.

70.    Further, at least since being served with this Complaint, the Nissan Defendants have indirectly infringed and continue to indirectly infringe at least claims 1, 2, 3, 4, 6, 7, 8, 9, 11, 12, 13, 15, 17, 18, 19, and 20 of the '442 Patent. The Nissan Defendants actively induce infringement of the '442 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, the Nissan Defendants knowingly induce their customers and dealers to use, sell, and offer for sale vehicles that they know or should know infringe one or more claims of the '442 Patent. The Nissan Defendants instruct their customers to use and instruct their vehicle dealers to sell and offer for sale vehicles containing the patented invention, and specifically intend for those customers and dealers to infringe one or more claims of the '442 Patent by using, selling, and offering for sale vehicles containing infringing technology such as ProPILOT Assist. Among other inducement actions, the Nissan Defendants' instructional, marketing, and sales materials inform customers and dealers about the use of ProPILOT Assist and tout the advantages of using ProPILOT Assist.

71.    The Nissan Defendants' acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from the Nissan Defendants the damages they have sustained as a result of the Nissan Defendants' wrongful acts

in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '442 Patent, together with interests and costs as fixed by the Court.

72.    The Nissan Defendants have had notice of the '442 Patent at least as of the date of this Complaint.

73.    At all times since the '442 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner. For example, since the '442 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Perrone Robotics, Inc. Copyright 2024. All rights reserved. TONY and MAX are patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251, 11,782,442) and Canada (2643378). TONY and MAX have additional patents pending. MAX, Perrone Robotics, TONY, and Mobility of People and Things are registered trademarks of Perrone Robotics.

## COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 11,314,251

74.    Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

75.    On April 26, 2022, the United States Patent and Trademark Office duly and legally issued the '251 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '251 Patent is attached as Exhibit C.

76.    The '251 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

77.    Perrone Robotics owns all rights, title, and interest in and to the '251 Patent, including the right to assert all causes of action under the '251 Patent and the right to any remedies for the infringement of the '251 Patent.

78.     The '251 Patent is generally directed to a novel autonomous vehicle which includes a GPROS that enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

79.     The Nissan Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, claims 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the '251 Patent, in violation of 35 U.S.C. § 271(a) by their manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include ProPILOT Assist. The Nissan Defendants have also directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '251 patent that are identified in the prior sentence when they perform the methods by testing and using their own infringing vehicles, including but not limited to vehicles that include ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the '251 Patent literally or under the doctrine of equivalents.

80.     For example, claim 2 of the '251 Patent recites:

2. An autonomous vehicle comprising:

a vehicle having a steering mechanism, a brake, and a throttle, wherein the vehicle is equipped with a general purpose robotics operating system comprising a set of application services, wherein the set of application services comprises a service to manage synchronous, asynchronous, and real time application threads, wherein the application services are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, and wherein the set of application services

(i) is configurable using a configuration service,

(ii) is configurable to be adapted both statically and dynamically, and

(iii) is configurable to access configuration data using a generic abstraction;

a steering servomechanism connected to the vehicle and configured to control the steering mechanism based on a movement plan;

23

a brake servomechanism connected to the vehicle and configured to apply and release the brake based on the movement plan; and

a throttle servomechanism connected to the vehicle and configured to increase and decrease the throttle based on the movement plan.

81.    By way of a non-limiting example, the Nissan Defendants have infringed claim 2 of the '251 Patent with Nissan and Infiniti vehicles that use ProPILOT Assist such as the Nissan Rogue.

82.    The Nissan Defendants' vehicles such as the Nissan Rogue comprise autonomous vehicles, as required by claim 2. By way of example, ProPILOT Assist provides autonomous vehicle functions in vehicles such as the Nissan Rogue.

83.    Autonomous vehicles such as the Nissan Rogue have a steering mechanism, a brake, and a throttle, as required by claim 2. By way of example, lane centering relies on a steering mechanism to keep the vehicle centered in the lane. ProPILOT Assist's intelligent cruise control relies on a brake and throttle servomechanism to increase or decrease speed.

84.    Autonomous vehicles that use ProPILOT Assist such as the Nissan Rogue are equipped with a GPROS comprising a set of application services, as required by claim 2. On information and belief, vehicles with ProPILOT Assist have relied on GPROSs that include a proprietary GPROS built in conjunction with Red Hat; a Linux-based GPROS; a MICROSAR GPROS; and an AUTOSAR-based GPROS.

85.    Vehicles with ProPILOT Assist practice a set of application services that comprises a service to manage synchronous, asynchronous, and real time application threads, as required by claim 2. On information and belief, vehicles with ProPILOT Assist have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with ProPILOT Assist receive messages from certain synchronous, asynchronous, and

real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

86.    Vehicles with ProPILOT Assist practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks, as required by claim 2. By way of example, ProPILOT Assist is independent of the underlying platform and can be used across Nissan and Infiniti models, including the Nissan Rogue. vehicles with ProPILOT Assist perform operational tasks, including intelligent cruise control and lane centering. Vehicles with ProPILOT Assist perform communication tasks such as communication with the sensors and over-the-air updates.

87.    Vehicles with ProPILOT Assist practice a set of application services that is configurable using a configuration service, configurable to be adapted both statically and dynamically, and configurable to access configuration data using a generic abstraction, as required by claim 2. By way of example, vehicles with ProPILOT Assist allow for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. ProPILOT Assist calibration is performed both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

88.    Vehicles with ProPILOT Assist practice a steering servomechanism connected to the vehicle and configured to control the steering mechanism based on a movement plan, a brake servomechanism connected to the vehicle and configured to apply and release the brake based on

the movement plan, and a throttle servomechanism connected to the vehicle and configured to increase and decrease the throttle based on the movement plan, as required by claim 2. By way of example, lane centering relies on a steering servomechanism to keep the car centered in the lane based on a movement plan. ProPILOT Assist's intelligent cruise control relies on a brake and throttle servomechanism to increase or decrease the throttle based on the movement plan.

89.     For the reasons discussed above as well as throughout in the context of other patent claims, the Nissan Defendants' vehicles with ProPILOT Assist also infringe claims 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19.

90.     Further, at least since being served with this Complaint, the Nissan Defendants have indirectly infringed and continue to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the '251 Patent. The Nissan Defendants actively induce infringement of the '251 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, the Nissan Defendants knowingly induce their customers and dealers to use, sell, and offer for sale vehicles that they know or should know infringe one or more claims of the '251 Patent. The Nissan Defendants instruct their customers to use and instruct their vehicle dealers to sell and offer for sale vehicles containing the patented invention, and specifically intend for those customers and dealers to infringe one or more claims of the '251 Patent by using, selling, and offering for sale vehicles containing infringing technology such as ProPILOT Assist. Among other inducement actions, the Nissan Defendants' instructional, marketing, and sales materials inform customers and dealers about the use of ProPILOT Assist and tout the advantages of using ProPILOT Assist.

91.     The Nissan Defendants' acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from the Nissan

Defendants the damages they have sustained as a result of the Nissan Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '251 Patent, together with interests and costs as fixed by the Court.

92.     The Nissan Defendants have had notice of the '251 Patent at least as of the date of this Complaint.

93.     At all times since the '251 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software's info file.

94.     Likewise, since the '251 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

Copyright 2022. Perrone Robotics, Inc. All rights reserved. MAX is patented in the U.S. (9,195,233, 9,833,901, 10,331,136, 10,379,007, 11,280,704, 11,314,251). MAX is patent pending internationally. MAX, Perrone Robotics, & TONY are trademarks of Perrone Robotics.

## COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 9,833,901

95.     Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

96.     On December 5, 2017, the United States Patent and Trademark Office duly and legally issued the '901 Patent titled "General Purpose Robotics Operating System with Unmanned and Autonomous Vehicle Extensions" to Perrone Robotics, Inc. A copy of the '901 Patent is attached as Exhibit D.

97.     The '901 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

98.    Perrone Robotics owns all rights, title, and interest in and to the '901 Patent, including the right to assert all causes of action under the '901 Patent and the right to any remedies for the infringement of the '901 Patent.

99.    The '901 Patent is generally directed to a novel GPROS which enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

100.    The Nissan Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, all claims (1–20) of the '901 Patent, in violation of 35 U.S.C. § 271(a) by their manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include ProPILOT Assist. The Nissan Defendants have also directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '901 patent when they perform the methods by testing and using their own infringing vehicles, including but not limited to vehicles that include ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the claims of the '901 Patent literally or under the doctrine of equivalents.

101.    For example, claim 1 of the '901 Patent recites:

1. A method

in a general purpose robotics operating system (GPROS) comprising a set of application services, executed using a computing device comprising a processor, the method comprising:

managing synchronous, asynchronous, and real time application threads using at least one of the application services; and

managing at least one of an autonomous vehicle service and an autonomous movement planning service using at least one of the application services,

wherein the set of application services:

    (i) is configurable using a configuration service,

(ii) is configurable to be adapted both statically and dynamically, and

(iii) is configurable to access configuration data using a generic abstraction, and

wherein the application services are independent of an underlying hardware platform and are configurable to perform at least one of communication tasks and operational tasks.

102.    By way of a non-limiting example, the Nissan Defendants have infringed claim 1 of the '901 Patent with Nissan and Infiniti vehicles that use ProPILOT Assist such as the Nissan Rogue. The Nissan Defendants perform the method identified in claim 1 of the '901 patent and in the other infringed method claims of the '901 patent identified above when they test and use their own infringing vehicles, including vehicles that use ProPILOT Assist such as the Nissan Rogue.

103.    Vehicles with ProPILOT Assist practice a method in a GPROS comprising a set of application services, executed using a computing device comprising a processor, as required by claim 1. On information and belief, ProPILOT Assist has relied on GPROSs that include a proprietary GPROS built in conjunction with Red Hat; a Linux-based GPROS; a MICROSAR GPROS; and an AUTOSAR-based GPROS. ProPILOT Assist is executed by using a computing device (*e.g.*, an Electronic Control Unit or ECU) that comprises a processor (*e.g.*, microcontrollers and microprocessors).

104.    Vehicles with ProPILOT Assist practice managing synchronous, asynchronous, and real time application threads using at least one of the application services, as required by claim 1. On information and belief, vehicles with ProPILOT Assist have a service to manage multiple threads providing information from, for example, sensors. On information and belief, vehicles with ProPILOT Assist receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

29

105.    Vehicles with ProPILOT Assist practice managing at least one of an autonomous vehicle service and an autonomous movement planning service using at least one of the application services, as required by claim 1. By way of example, vehicles with ProPILOT Assist use an autonomous movement planning service when they use lane centering to move the steering wheel to keep the vehicle centered in a lane based on a movement plan.

106.    Vehicles with ProPILOT Assist have a set of application services that are configurable using a configuration service, are configurable to be adapted both statically and dynamically, and are configurable to access configuration data using a generic abstraction, as required by claim 1. By way of example, ProPILOT Assist allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. ProPILOT Assist calibration is performed both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

107.    Vehicles with ProPILOT Assist practice a set of application services that are independent of an underlying hardware platform and are configurable to perform at least one of communications tasks and operational tasks. By way of example, ProPILOT Assist is independent of the underlying platform and can be used across Nissan and Infiniti models, including the Nissan Rogue. Vehicles with ProPILOT Assist perform operational tasks, including intelligent cruise control and lane centering. Vehicles with ProPILOT Assist perform communication tasks such as communication with the sensors and over-the-air updates.

108.    For the reasons discussed above as well as throughout in the context of other patent claims, the Nissan Defendants' vehicles with ProPILOT Assist also infringe claims 2–20. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 2 because the set of application services comprises a system service which allows one system to execute or trigger one or more other systems, based on at least one of: a trigger, and one or more parameterized conditions based on condition evaluations. For example, vehicles with ProPILOT Assist execute or trigger certain ADAS applications based on triggers or conditions arising from multiple sensors.

109.    Further, at least since being served with this Complaint, the Nissan Defendants have indirectly infringed and continue to indirectly infringe all claims of the '901 Patent. The Nissan Defendants actively induce infringement of the '901 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, the Nissan Defendants knowingly induce their customers and dealers to use, sell, and offer for sale vehicles that they know or should know infringe one or more claims of the '901 Patent. The Nissan Defendants instruct their customers to use and instruct their vehicle dealers to sell and offer for sale vehicles containing the patented invention, and specifically intend for those customers and dealers to infringe one or more claims of the '901 Patent by using, selling, and offering for sale vehicles containing infringing technology such as ProPILOT Assist. Among other inducement actions, the Nissan Defendants' instructional, marketing, and sales materials inform customers and dealers about the use of ProPILOT Assist and tout the advantages of using ProPILOT Assist.

110.    The Nissan Defendants' acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from the Nissan Defendants the damages they have sustained as a result of the Nissan Defendants' wrongful acts

in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '901 Patent, together with interests and costs as fixed by the Court.

111.    The Nissan Defendants have had notice of the '901 Patent at least as of the date of this Complaint.

112.    At all times since the '901 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software's info file.

113.    Likewise, since the '901 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

© 2018 Perrone Robotics. All rights reserved. Perrone Robotics and MAX are registered trademarks of Perrone Robotics, Inc. MAX is patented in the U.S. (9,195,233, 9,833,901). MAX is patent pending internationally. AVTS, the DAK, and TRV are patent pending.

## COUNT 5 – INFRINGEMENT OF U.S. PATENT NO. 9,195,233

114.    Perrone Robotics incorporates by reference its allegations in the preceding paragraphs as if fully restated in this paragraph.

115.    On November 24, 2015, the United States Patent and Trademark Office duly and legally issued the '233 Patent titled "General Purpose Robotics Operating System" to Perrone Robotics, Inc. A true and correct copy of the '233 Patent is attached as Exhibit E.

116.    The '233 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

117.    Perrone Robotics owns all rights, title, and interest in and to the '233 Patent, including the right to assert all causes of action under the '233 Patent and the right to any remedies for the infringement of the '233 Patent.

118.    The '233 Patent is generally directed to a novel GPROS, which enables robotics and automation applications by providing a standardized, full-service platform that is configurable to be used with various robotics and automation applications.

119.    The Nissan Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '233 Patent, including at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27, in violation of 35 U.S.C. § 271(a) by their manufacture, use, sale, importation and/or offer for sale of Infringing Products, including but not limited to vehicles that include ProPILOT Assist. The Nissan Defendants have also directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, the method claims in the '233 patent that are identified in the prior sentence when they perform the methods by testing and using their own infringing vehicles, including but not limited to vehicles that include ProPILOT Assist. The Infringing Products (identified preliminarily in Exhibit F) meet every limitation of the relevant claims of the '233 Patent literally or under the doctrine of equivalents.

120.    For example, claim 1 of the '233 Patent recites:

1. A non-transitory medium encoding a general purpose robotics operating system, an automation operating system, or both a general purpose robotics operating systems and an automation operating system (GPROS), wherein the GPROS comprises:

a set of application services, the set of application services comprising at least one of robotics application services, automation application services, or both robotics and automation application services,

wherein the set of application services (i) is completely configurable by using a config service, (ii) can be adapted both statically and dynamically, and (iii) provides access to configuration data using a generic abstraction,

wherein the set of application services are independent of an underlying hardware platform and allow for combinations of communication, operational, or both communication and operational conduct for communication, operational, or both communication and operational tasks, and

wherein the set of application services comprises (1) a peripheral service, and (2) a sensor service, an actuator service, or both a sensor service and an actuator service, and wherein

the set of application services comprises a service to manage synchronous, asynchronous, and real time application threads.

121. By way of a non-limiting example, the Nissan Defendants have infringed the '233 Patent with Nissan vehicles that use ProPILOT Assist such as the Nissan Rogue.

122. Vehicles with ProPILOT Assist practice a non-transitory medium encoding a GPROS, an automation operating system, or both a GPROS and an automation operating system, as required by claim 1. On information and belief, vehicles with ProPILOT Assist have relied on GPROS that include a proprietary GPROS built in conjunction with Red Hat; a Linux-based GPROS; a MICROSAR GPROS; and an AUTOSAR-based GPROS.

123. Vehicles with ProPILOT Assist practice a set of application services, the set of application services comprising at least one of robotics application services, automation application services, or both robotics and automation application services, as required by claim 1. By way of example, vehicles with ProPILOT Assist practice a set of automation application services such as intelligent cruise-control and lane centering. These are available features in certain Nissan Rogue models.

124. Vehicles with ProPILOT Assist practice a set of applications that is completely configurable by using a config service, can be adapted both statically and dynamically, and provides access to configuration data using a generic abstraction, as required by claim 1. By way of example, ProPILOT Assist allows for ADAS settings to be configured using a generic abstraction that is independent of any underlying hardware platform and can be used across devices. ProPILOT Assist calibration is performed both statically and dynamically. By way of example, a driver can statically adjust ADAS settings at startup and can also dynamically adjust

34

them as the vehicle is moving. As another example, the sensors undergo both static and dynamic calibration processes to ensure accurate functioning, with static calibration aligning the sensors in a controlled environment and dynamic calibration aligning the sensors while driving.

125.    Vehicles with ProPILOT Assist practice a set of application services that are independent of an underlying hardware platform and allow for combinations of communication, operational, or both communication and operational conduct for communication, operational, or both communication and operational tasks, as required by claim 1. By way of example, ProPILOT Assist is independent of the underlying platform and can be used across Nissan and Infiniti models, including the Nissan Rogue. Vehicles with ProPILOT Assist perform operational tasks, including intelligent cruise control and lane centering. Vehicles with ProPILOT Assist perform communication tasks such as communication with the sensors and over-the-air updates.

126.    Vehicles with ProPILOT Assist practice a set of application services comprising a peripheral service, and a sensor service, an actuator service, or both a sensor service and an actuator service, as required by claim 1. By way of example, vehicles with ProPILOT Assist perform a peripheral service such as the instrument cluster display, and they also perform peripheral services when they perform actuator and sensor services. Vehicles with ProPILOT Assist perform a sensor service such as using a front radar sensor to calculate the distance from the vehicle ahead or an obstacle for intelligent cruise control. Vehicles with ProPILOT Assist perform an actuator service such as a throttle control, which is used in intelligent cruise control.

127.    Vehicles with ProPILOT Assist practice a set of application services that comprises a service to manage synchronous, asynchronous, and real time application threads, as required by claim 1. On information and belief, vehicles with ProPILOT Assist have a service to manage multiple threads providing information from, for example, sensors. On information and belief,

vehicles with ProPILOT Assist receive messages from certain synchronous, asynchronous, and real-time application threads and use the service to determine how to process and prioritize the information to make the ADAS applications function.

128.    For the reasons discussed above as well as throughout in the context of other patent claims, the Nissan Defendants' vehicles with ProPILOT Assist also infringe claims 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27 of the '233 Patent. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 13 because the hardware retains the software indefinitely because, for example, the hardware, e.g. ROM permanently stores the operating system. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 14 because vehicles with ProPILOT Assist include hardware which is a computer hard drive. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claim 15 because the hardware retains the software ephemerally, including by for example having the hardware (e.g., RAM) load the operating system temporarily while running the system. Additionally, and as a non-limiting example, vehicles with ProPILOT Assist infringe claims 23 and 24 because the software is capable of being updated or otherwise modified before, during, and after fabrication of the device and the device is capable of learning by way of updates or modification of the software, including through over-the-air updates.

129.    Further, at least since being served with this Complaint, the Nissan Defendants have indirectly infringed and continue to indirectly infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, and 27 of the '233 Patent. The Nissan Defendants actively induce infringement of the '233 Patent under 35 U.S.C. § 271(b). With specific intent to induce infringement, the Nissan Defendants knowingly induce their customers and dealers to use, sell, and offer for sale vehicles that they know or should know infringe one or more claims of the '233

Patent. The Nissan Defendants instruct their customers to use and instruct their vehicle dealers to sell and offer for sale vehicles containing the patented invention, and specifically intend for those customers and dealers to infringe one or more claims of the '233 Patent by using, selling, and/or offering for sale vehicles containing infringing technology such as ProPILOT Assist. Among other inducement actions, the Nissan Defendants' instructional, marketing, and sales materials inform customers and dealers about the use of ProPILOT Assist and tout the advantages of using ProPILOT Assist.

130.    The Nissan Defendants' acts of infringement have caused and continue to cause damage to Perrone Robotics, and Perrone Robotics is entitled to recover from the Nissan Defendants the damages they have sustained as a result of the Nissan Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '233 Patent, together with interests and costs as fixed by the Court.

131.    The Nissan Defendants have had notice of the '233 Patent at least as of the date of this Complaint.

132.    At all times since the '233 Patent issued, Perrone Robotics has marked the patented articles it makes and offers for sale in the United States under 35 U.S.C. § 287 in a substantially consistent and continuous manner, including by marking the patent on the MAX software's info file.

133.    Likewise, since the '233 Patent's issuance, Perrone Robotics, Inc. has included on its website a patent mark:

© 2015 Perrone Robotics. All rights reserved. Perrone Robotics and MAX are registered trademarks of Perrone Robotics, Inc. MAX is patented in the U.S. (Patent No. 9,195,233). MAX is patent pending internationally. AVTS, the DAK, and TRV are patent pending.

## JURY DEMAND

134.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Perrone

Robotics, Inc. and Perrone Robotics Innovations, LLC demand a trial by jury on all issues.

## FEES AND COSTS

135.    To the extent that the Court finds that this is an "exceptional case," an award of

attorneys' fees and costs to Perrone Robotics is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

Plaintiffs Perrone Robotics, Inc. and Perrone Robotics Innovations, LLC request entry of

judgment in their favor and against the Nissan Defendants as follows:

a.    Declaring that the Nissan Defendants have infringed the Patents-in-Suit,

contributed to the infringement of the Patents-in-Suit, and/or induced the infringement of the

Patents-in-Suit;

b.    Awarding Perrone Robotics damages arising out of this infringement of the Patents-

in-Suit and prejudgment and post-judgment interest, in an amount according to proof;

c.    Awarding Perrone Robotics attorneys' fees pursuant to 35 U.S.C. § 285 or as

otherwise permitted by law; and

d.    Awarding Perrone Robotics such other costs and further relief as the Court may

deem just and proper.

Date: November 25, 2025

Respectfully submitted,

/s/ Tara R. Zurawski

_____
Tara R. Zurawski (VA 73602)
BUNSOW De MORY LLP
277 S. Washington St.
Suite 210, #1088
Alexandria, VA 22314
Phone: (415) 426-4729
Fax: (415) 426-4744
tzurawski@bdiplaw.com

Shawn Blackburn (TX 24089989) *PHV forthcoming*
Sy Polky (TX 24102365) *PHV forthcoming*
Hunter Vance (TX 24102596) *PHV forthcoming*
Larry Liu (TX 24133399) *PHV forthcoming*
Whitney Wester (TX 24080420) *PHV forthcoming*
SUSMAN GODFREY L.L.P.
1000 Louisiana
Suite 5100
Houston, TX 77002
Phone: (713) 651-9366
Fax:    (713) 654-6666
sblackburn@susmangodfrey.com
spolky@susmangodfrey.com
hvance@susmangodfrey.com
lliu@susmangodfrey.com
wwester@susmangodfrey.com

Sarah Pike (CA 337690) *PHV forthcoming*
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax: (310) 789-3150
spike@susmangodfrey.com

*Attorneys for Plaintiffs Perrone Robotics, Inc. and
Perrone Robotics Innovations, LLC*